IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| TKO SPORTS GROUP USA LIMITED, | § § § | CASE NO. 05-48509-H4-11<br>CHAPTER 11 |
| DEBTOR | § | |

## DEBTOR'S COMBINED OBJECTION TO FINAL FEE APPLICATIONS OF ARENT FOX, PLLC AND BARNET SKELTON AS COUNSEL TO THE OFFICIAL UNSECURED CREDITORS COMMITTEE (DOC. 335, 337)

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The Reorganized Debtor, TKO Sports Group USA Limited ("TKO") hereby objects to the Final Fee Applications filed by Arent Fox, PLLC ("Arent Fox") and Barnet Skelton as counsel to the Committee (collectively referred to as "Committee Counsel"). The grounds for this objection are as follows:

### Summary of Objection

1. **Fees and Expenses Requested.** Arent Fox acted as counsel to the Official Committee of Unsecured Creditors (the "Committee") is seeking $249,605 in fees and $12,520.37 in expenses for a total of $262,124.37. Barnet Skelton acted as local counsel for the Committee and is seeking final allowance of fees in the amount of $52,377.50 and $2,563.44 in expenses for a total of $54,940.94. Thus, the total amount of legal fees and expenses charged by counsel for the Committee in this case is $317,065.31.[1] Pursuant to the terms of the confirmed plan, the unsecured creditors are receiving fifteen cents on the dollar which is half of what the Debtor originally proposed, and which was rejected out of hand by Committee Counsel back in December. Thus, as more fully discussed below, TKO submits that the fee applications must be

---

[1] This does not include the $35,000 charged by the Committee's financial advisors.

{L:\tko000\00012\0413719.DOC;2\ELR}

1

denied because the Applicant did not provide any tangible benefit to the estate as required by well established Fifth Circuit authority. In fact, it can be shown that the actions of the Committee cost the estate approximately $1.0 million in operating losses. By contrast, the Fee Application filed by counsel for the Debtor totaled approximately $153,858.06. Thus, the Committee's fees are more than double that of the Debtor while counsel for the Debtor clearly shouldered much more of the burden.

2. **Committee Counsels' fees are unnecessary and/or unreasonable largely because they dramatically overstaffed the case.** In this case, Arent Fox utilized the services of no less than 12 attorneys and 3 paralegals. When you add Mr. Skelton, the Committee actually deployed 16 professional to represent the interests of the creditors. On the other hand, TKO utilized four professionals. This massive overstaffing produced a significant amount of duplication of effort and caused the Committee's fees to skyrocket.

3. **Hourly Rates.** The Hourly rates charged by Arent Fox are far higher than the norm for the community.

4. **Failure to Disclose Connections.** Arent Fox failed to timely disclose all "connections" as required by Bankruptcy Rule 2014. Thus, all fees and expenses incurred prior to full disclosure may be disallowed.

5. **Lumped Time Entries.** The Fee Applications contain numerous lumped time entries where one cannot tell how much time was spent on a particular task or whether the amount of time was reasonable.

6. **Multiple Attorneys in Attendance at Hearings.** Multiple attorneys from Arent Fox and Mr. Skelton attended most of the hearings in this case. The Fee Applications did not contain an adequate explanation of the reason multiple attorneys were needed.

7. **Vague Entries.** The Fee Applications contain numerous vague entries where there is no way to tell if the amount of time spent was justified.

8. **Reimbursable Expenses.** Arent Fox reimbursable expenses which exceeded amount permitted by local practice.

## Factual Background

9. A detailed discussion of the factual background of this case is essential for the Court to understand the context in which these fees were incurred.

10. This Chapter 11 case was filed on October 11, 2005. TKO is a distributor of sporting goods equipment primarily in the boxing, health and fitness space. Its primary customers are big box retail stores. This case was not filed as, nor did it ever constitute, a complex chapter 11 case.

11. The principal cause of the bankruptcy filing was TKO's inability to deal with $5.2 million in secured debt owed to the Bank of Montreal.

12. The game plan upon entering bankruptcy was to attempt to negotiate an agreement with the Bank of Montreal to reduce the secured debt by half and refinance it. Assuming success, TKO then intended to meet with its big box store customers in early January 2006 to assure them of a continued supply and to maintain shelf space for the balance of 2006.

13. Difficult negotiations with the Bank of Montreal began prior to filing of the Chapter 11 case and continued thereafter.

14. On November 23, 2005, the U.S. Trustee appointed the Official Unsecured Creditors Committee (the "Committee"), and an application to employ Arent Fox was filed on December 5, 2005.

15. On December 12, 2005, just one week after appointment of the Committee, TKO successfully negotiated an agreement with the Bank of Montreal to reduce the $5.2 million debt to $2.6 million and waive the deficiency. As stated above, TKO needed to get approval of this settlement prior to the end of December in order to ensure shelf space for the year 2006. Thus, it immediately filed an emergency motion to approve the settlement.

16. In view of its late entry into the case, Arent Fox demanded thousands of documents on a very quick basis in order to get up to speed and advise the Committee on the settlement. Despite the production of thousands of documents and several depositions showing no real substantive problem with the BOM debt or security interest Committee Counsel insisted on objecting to the settlement because it believed it could get a better deal for the creditors, regardless of the costs or benefit.

17. Consequently, the Committee objected to the settlement. The Court heard the objection in a contested hearing on December 28, 2005, and refused to approve it over the Committee's objection.

18. As a result of its failure to obtain approval of the deal with the Bank of Montreal, TKO lost shelf space at the big box retailers for the year 2006 and sales plummeted after January 2006 from $852,000 in that month to $370,000 in February and averaging about $478,000 per month through July of this year. The loss in sales resulted in huge losses every month. To date, TKO has not been able to recover the lost sales and it will not have an opportunity to present a proposal for shelf space to the big box retailers until January 2007.

19. On January 9, 2006, the Committee indeed succeeded in negotiating a better deal with the Bank of Montreal. Instead of paying the Bank of Montreal $2.6 million, the agreement states that the Bank of Montreal will be paid $2.45 million and that $150,000 of the payment will

be allocated to the unsecured creditors for a net settlement of $2.3 million or $300,000 better than the one previously obtained by TKO. For this benefit, Arent Fox and Barnet Skelton charged the estate $317,065.31, and this does not include the $35,000 charged by the Committee's financial advisors. Thus, the net benefit to the estate provided by Committee professionals was really negative.

20.    The futility of the efforts of the Committee professionals is underscored by the fact that assuming the original settlement with the Bank of Montreal was approved on December 28, 2005, TKO intended to quickly file and confirm a plan which would have paid the unsecured creditors as much as thirty cents on the dollar.

21.    In March 2006, TKO offered Committee Counsel a plan whereby the creditors would be paid fifteen cents on the dollar of three years. Committee Counsel rejected this proposal and made a counteroffer which TKO clearly could not fund. In order to break the logjam created by Committee Counsel, the principle of TKO, Mr. Kurtz communicated directly with the members of the Committee who accepted the fifteen cent proposal.

22.    Consequently, on August 23, 2006, the Court confirmed TKO's First Amended Plan which provides for a payout to unsecured creditors of fifteen cents on the dollar.

23.    In reality, the only beneficiary of the improved settlement with the Bank of Montreal will be the Committee professionals should the Court approve their fees in full.

24.    Finally, the damage caused to TKO in this case was particularly outrageous in view of the fact that no less than 13 attorneys and three paralegals billed time to this case where no more than two or three at most were necessary. If the case was properly staffed, the Committee fees would have been drastically less even with their "New York" rates.

## STANDARD OF REVIEW FOR FEE APPLICATIONS

25. This Court bears the responsibility of determining the appropriateness of all fee applications, even in the absence of an objection. See *Gardere & Wynne v. Turoff (In re Hunt)*, 196 B.R. 356, 359 (N.D. Tex. 1996). The test of whether fees and expenses are reasonable and necessary pursuant to Section 330 of the Code is conducted at the time of the hearing on the application. That is, the court's review does not look at the reasonableness of services or expenses at the time they were incurred; instead the court employs a hindsight analysis. *In the Matter of Pro-Snax Distribs Inc.*, 157 F.3d 414, 426 (5th Cir. 1998). (The test is an objective after-the-fact test: "whether services resulted in an identifiable, tangible, and material benefit to the bankruptcy estate," regardless of the reasonableness of such services at the time that they were rendered). Id. Accord *In re Bennett*, 133 B.R. 374, 378 (Bankr. N.D. Tex. 1991).[2]

26. In conducting its hindsight analysis, the court is guided by certain standards. To wit, the burden of proof is on the fee applicant to establish that its fees are "reasonable and necessary". 11 U.S.C. § 330. *See Also In re Hunt*, 196 B.R. at 359; *In re MFlex Corp.*, 172 B.R. 854, 860-61 (Bankr. W.D. Tex. 1994). *See Also: In re Gillett Holdings, Inc.*, 137 B.R. 462, 471 (Bankr.D.Colo. 1992).

27. In determining if the professional's services are "reasonable and necessary" the Court must, by necessity, look principally to the contents of the fee application, i.e. the application should be self contained as "courts should not spend nonexistent court resources to track down every entry, correlate them against other fee applications, and delete those entries insufficiently substantiated. An application for fees should be self-contained, including enough

---

[2] While *Pro-Snax* dealt with whether debtor's counsel was entitled to be compensated pursuant to section 330, the Court's analysis of section 330 applies with equal force to all fee applications, including those of counsel for the creditors committees. Thus, to be entitled to compensation, LLS must demonstrate that its efforts produced a material benefit.

material on its face to review the charges." *In re New England Caterers*, Inc., 115 Bankr. 724, 729 (Bankr. D. Mass. 1989) (citations omitted). A failure to provide detailed records warrants the reduction or disallowance of fees. Id. *See Also In re Bank of New England Corporation*, 142 B.R. 584 (D.Ct Mass. 1992); *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 952 (1st Cir. 1984) ("the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction'). (*See Also* Guideline II.A. "all professionals must keep accurate contemporaneous time records").

28.  Furthermore, in assessing the reasonableness of the requested fees, a court is to consider several factors . . . which call upon the court to weigh the time and labor devoted to the matter, its difficulty, whether the fee is fixed of contingent, the amount involved, the results obtained, and awards in similar cases. Additionally, the court is to bear in mind that the debtor's estate must be administered as efficiently and economically as possible, and that sometimes bankruptcy attorneys perform dual functions which might lead to an award of duplicative fees if overlooked. *In re Hudson Shipbuilders, Inc.*, 794 F.2d 1051, 1058 (5th Cir. 1986) (citing *In re First Colonial Corp. of America*, 544 F.2d 1291, 1299 (5th Cir. 1977) and *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)). The bankruptcy court is to assess the First Colonial factors to determine the adjusted lodestar amount, representing the reasonable number of hours expended multiplied by reasonable hourly rates. *In re Nucentrix Broadband Networks, Inc.*, 314 B.R. 581, 590 (Bankr. N.D. Tex. 2004).

29.  Finally, the Court's allowance of interim fee applications for Committee Counsel is totally irrelevant to the determination of the final fee applications. TKO negotiated an interim allowance of fees so Committee Counsel could receive a partial payment and reserved all of its rights in the orders allowing the interim fee payment to object to fees incurred for the entire case.

Case 05-48509   Document 342   Filed in TXSB on 10/10/2006   Page 8 of 18

*See Doc. 319 and 320.* Moreover, it is black letter law that a court may reduce an interim fee award at the time of the final fee applications. *See* In re Evangeline Refining Co), 890 F.2d 1312, 1321 (5th Cir. 1989).

## OBJECTIONS

### A.   Committee Counsel Provided No Material Benefit

30.   The Fifth Circuit Court of Appeals ruled that in order for an attorney to be entitled to compensation pursuant to Section 330, the attorney must demonstrate that his efforts provided a "material benefit." *Andrews & Kurth L.L.P. v. Family Snacks Inc. (In the Matter of Pro-Snax Distribs Inc.)*, 157 F.3d 414, 426 (5th Cir. 1998).[3] (The test is an objective after-the-fact test: "whether services resulted in an identifiable, tangible, and material benefit to the bankruptcy estate," regardless of the reasonableness of such services at the time that they were rendered). Accord *In re Bennett*, 133 B.R. 374, 378 (Bankr. N.D. Tex. 1991). The only material benefit produced by the Committee was to improve the settlement with BOM by the net amount of $300,000. TKO submits, however, that this "benefit" did not materially benefit the bankruptcy estate for the following reasons.

31.   First, the fees and expenses charged by the Committee exceeded the amount of the benefit. Hence, it appears that the only parties to benefit from the improved settlement were the Committee Professionals.

32.   Second, the manner in which the Committee went about procuring the improved settlement cost TKO in excess of $3 million in sales for the year 2006. As stated above, TKO

---

[3] While the *Pro-Snax* dealt with the issue of whether debtor's counsel was entitled to be compensated pursuant to section 330, the Court's analysis of section 330 applies to all fee applications, including those of counsel for the creditors committee. Thus, in order to be entitled to compensation, Committee Counsel must demonstrate that efforts produced a material benefit for the estate and its creditors. Absent such a showing, Committee Counsel fees must be denied.

{L:\tko000\00012\0413719.DOC;2\ELR}

needed a resolution with BOM prior to the end of the year in order to maintain shelf space with its larges customers. Committee Counsel ignored this very important business consideration and succeeded in having the settlement proposed by TKO disallowed. The evidence will show that after this event TKO's revenues plummeted and it was relegated for the most part to simply liquidating the BOM collateral to satisfy the settlement at a huge loss. In this sense, Committee Counsel not only failed to benefit the estate, but actually harmed the estate.

33. Last, assuming the settlement with BOM was approved by the end of December, TKO intended to file a plan which proposed to pay the creditors thirty cents on the dollar and emerge from bankruptcy as quickly as possible. Absent the sales from the lost shelf space, this could not be accomplished. Instead, the case dragged on while TKO liquidated the BOM collateral and feebly tried to find refinancing. Without the additional sales and a positive EBITDA, nobody, other than a factor, was willing to loan money to TKO. The factoring arrangement was so expensive, that TKO decided it would be more effective to simply continue to liquidate BOM collateral and try to emerge from bankruptcy in the hopes of recovering the shelf space for 2007.

34. In conclusion, the actions of Committee Counsel came perilously close to killing TKO as opposed to supplying a benefit. Thus, TKO submits that the fee applications should be denied.

**B.    Dramatic Overstaffing of the Case**

35. In this case, Arent Fox utilized the services of no less than 12 attorneys and 3 paralegals. When you add Mr. Skelton, the Committee actually deployed 16 professional to represent the interests of the creditors. On the other hand, TKO utilized four professionals. This massive overstaffing produced a significant amount of duplication of effort and caused the

Committee's fees to skyrocket. There are several ways to look at this problem. First, Committee Counsel worked 809.70 hours for the entire case. TKO's counsel worked 588.60 hours in this case. TKO's counsel started the case on October 11 and Committee Counsel did not get involved until November 28 or approximately 7 weeks later. All fee applications end on the same date. Thus, Committee counsel worked 221.1 hours more than TKO's while being involved for a substantially shorter period of time.

36.    Moreover, the first few weeks of case is typically extremely busy. Hence the 588.60 hours spent by TKO's counsel included time spent working on all first day motions, several interim cash collateral orders, along with preparation and filing of the schedules and statement of affairs. This time also included negotiating a settlement with the BOM which provided for a reduction in secured debt of 50% and waiver of the deficiency claim. TKO counsel worked 109 hours during this period. In order to accurately compare the amount of time spent by TKO versus the amount of time spent by the Committee, these hours should be deducted. Accordingly, for the exact same time period during which counsel for TKO and Committee worked, counsel for TKO worked 479.6 hours and Committee Counsel worked 809.7. In terms of percentage, Committee Counsel put in 68% more hours during the same time period at a cost which was far more than double the amount spent by TKO's counsel. What is even more telling is that after the settlement with BOM in January, the primary task was to try to obtain post-petition financing and to negotiate a plan and disclosure statement. TKO Counsel was the primary party that drafted the DIP documents as well as the plan and disclosure statement. Committee Counsel acted only in a reviewing capacity.

37.    Typically the fees incurred by counsel for the debtor are higher than those for the committee because debtor's counsel does most of the work necessary to move the case forward

and committee counsel stands more in a position of reviewing and commenting on that work and negotiating the best deal it can for the unsecured creditors. In a recent opinion Judge Houser recognized and credited this macro level analysis in a remarkably similar case where the committee counsel ran up fees and expenses beyond those of debtor's counsel. *See* In re Teraforce Tech Corp., 2006 Bank. Lexis 1866 (Bankr. N.D. Tex 2006), where the Court stated,

> The Court agrees with the Objecting Parties' macro-level of analysis regarding LLS's fees for its work on the Joint Plan. While LLS was clearly unhappy with the provisions of the Joint Plan and sought through objections to contest and alter the Joint Plan, <u>it was unreasonable and unnecessary for LLS to incur fees at an approximate one-to-one ratio with Munsch Hardt.</u> In the Court's view, LLS's fees are exceedingly high for the work it did on the Joint Plan.

The underlined portion of the quote indicates that Judge Houser felt it was unreasonable for committee counsel to spend time and effort on a "one-to-one ratio" with debtor's counsel. In the case at bar, Committee Counsels' hours were 68% more than the hours worked by TKO's counsel. Surely, spending this amount of time was unreasonable and unnecessary.

38. The obvious reason for the huge disparity is the large number of attorneys used by Committee Counsel to staff this case. The case could easily have been staffed by one partner and either one or two associates and one paralegal. Instead, Arent Fox utilized twelve attorneys and three paralegal, plus Mr. Skelton. A brief review of the underlying invoices amply demonstrates the duplication of effort caused by this overstaffing.[4] At the hearing on these fee applications, TKO will demonstrate the duplication of effort with all of these attorneys by offering into evidence the underlying invoices and detailed analyses.

---

[4] Arent Fox did not include on its Final Fee Application the amounts incurred for the interim period. Thus, this analysis requires the Court to review three fee applications: the Arent Fox First Interim Fee Application (Doc. 218), the Arent Fox Final Fee Application and the Skelton Final Fee Application.

{L:\tko000\00012\0413719.DOC;2\ELR}

11

C.  **Excessive Hourly Rates**

39.  The Fifth Circuit Court of Appeals has long held that in determining whether fees are reasonable, the Court should multiply the number of hours reasonably spent by "the prevailing hourly rate in the community". *See* Cahill v. Walker & Patterson, P.C., 428 F.3d 536, 540 (5th Cir. 2005). The New York rates charged by Arent Fox are far higher than the rates charged in Houston, Texas for similar work. In making this determination, it is important for the Court to note that this was never designated as a "Complex Case" nor was it the type of case where the special expertise of a New York law firm was needed. There are numerous law firms in Houston, Texas which could have handled this case at lower rates. Arent Fox chose to pursue committee work in Texas and where it accepts an assignment in a plain vanilla Chapter 11 case like this one it should be willing to bill at Houston, Texas rates. Following is a table showing the rates charged by Arent Fox of all the professionals they used in this case and their years of experience.

| *Name* | *Experience* | *Rate* |
|---|---|---|
| Silfen | 20 | 575/595 |
| Carroll | 13 | 495/530 |
| Cryan | 10 | 435 |
| Hirsh | 6 | 420 |
| Eisenberg | 5 | 410 |
| Duarte | 6 | 350/390 |
| Angelich | 6 | 365 |
| Vogel | 6 | 360 |
| Hudson | 5 | 290 |

Case 05-48509   Document 342   Filed in TXSB on 10/10/2006   Page 13 of 18

| | | |
|---|---|---|
| Blankley | 1 | 240/285 |
| Witten | 3 | 260 |
| Peysakhovich | 0 | 180/250 |

The paralegals charged $210/ hour. In contrast, Mr. Skelton with 27 years of experience charges only $350/hour. At trial, TKO will demonstrate that usual and customary rates, even at large firms in Houston, are substantially lower. Thus, TKO submits that the lodestar rate should be reduced.

40. Further, in its initial application to be employed and the related affidavit, Mr. Carroll indicated that he would be the primary attorney handling the case and that he would charge the "preferred" rate of $445/hour. This affidavit was false in several respects. First, Mr. Carroll never charged $445. Instead he charged $495 for the balance of 2005 (i.e. one month) and then his rate when to $530 in 2006. Second, Mr. Carroll was not the primary attorney in charge. Rather, the primary attorney in charge for most of the case was Mr. Silfen who charged $575/hour in 2005 and $595/hour in 2006. Consequently, the court should, at a minimum, lower the rate of the lead attorney to the "preferred" rate of $445/hour or such lesser rate as it determines is standard in the community of Houston, Texas.

### D. Failure to Disclose Connections.

41. Arent Fox failed to timely disclose all "connections" as required by Bankruptcy Rule 2014. Thus, all fees and expenses incurred prior to full disclosure may be disallowed. *See* I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.), 432 F.3d 347, 355 (5th Cir. 2005), where the Fifth Circuit stated,

> Federal Rule of Bankruptcy Procedure 2014(a) requires any professional

applying for employment to set forth "to the best of the applicant's knowledge" all known connections of the applicant with the "debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Although this provision does not explicitly require ongoing disclosure, "case law has uniformly held that under Rule 2014(a), (1) full disclosure is a continuing responsibility, and (2) an attorney is under a duty to promptly notify the court if any potential for conflict arises." "Though this provision allows the fox to guard the proverbial hen house, <u>counsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation.</u>"

The underlined portion of the quote indicates that the court has authority to deny compensation where connections are not timely disclosed. Arent Fox filed its initial Rule 2014 affidavit with its application to employ on December 5, 2005 and disclosed certain connections all of whom were creditors it either currently or formerly represented. On December 19, 2005, Arent Fox filed a supplemental affidavit listing some additional creditors it either currently represented or represented in the past. Hence, the Court could disallow fees incurred from December 5, 2005 through December 19, 2005.

42.   Much worse, however, Arent Fox did not disclose its relationship to Joe Myers until the filing of an affidavit on April 10, 2006 (Doc. 176). Mr. Myers is and always has been the chair person of the creditors committee in the USA. According to the affidavit, Arent Fox has known and has represented Mr. Myers in previous cases. This disclosure should have been made at the commencement of the case. Arent Fox explained to TKO and the Court that it was chosen because of its relationships and knowledge of the principle creditors in this case who are all from China. In fact, Arent Fox did not know any of the members of the Committee. Rather, it was Mr. Myers who had these contacts and who recommended that the Committee select Arent Fox. Mr. Myers could easily have located a competent firm in Houston to represent the

Case 05-48509    Document 342    Filed in TXSB on 10/10/2006    Page 15 of 18

Committee. However, he recommended Arent Fox because he is a client of Arent Fox and because he wanted to refer work to them so they could make a profit and Mr. Myers hoped that he would obtain future business from Arent Fox. In reality, Arent Fox was not needed because of its familiarity with China or Chinese creditors. Had the parties known of this connection early on, TKO would have vehemently objected and the Court might not have approved the retention of Arent Fox. Even though this might not have risen to the level of a conflict of interest, it is clear that the "connection" should have been disclosed at the beginning of the case and that the court has the authority to deny fees for failure to disclose even where no actual harm or prejudice is shown.[5] *Id. at 357.* TKO submits therefore, that under the authority of *I.G. Petroleum*, the Court should refuse to approve all fees incurred by Arent Fox from the beginning of the representation until April 10, 2006, when this disclosure was made. Otherwise, the requirement for disclosing connections will be meaningless. This is particularly true with a sophisticated New York law firm like Arent fox which should know better.

### E.     Lumped Time Entries.

43.    It is well settled that when submitting fee application, attorneys are not suppose to lump various services together as to make it impossible to determine whether the time spent on a particular task was reasonable. *See, e.g.* In re Office Products of America, Inc., 136 B.R. 964, 976 (Bankr. D. Tex. 1992). The U.S. Trustee has issued guidelines indicating that it is acceptable to lump related tasks in no more than .5 hours increments. The Fee Applications contain numerous lumped time entries in excess of .5 hours where one cannot tell how much time was spent on a particular task or whether the amount of time was reasonable. At trial, TKO

---

[5] TKO submits that the prejudice here is the excessive fees which could have been avoided had Mr. Myers chosen to use local firm instead of Arent Fox.

will list out the time entries that were lumped so the Court can assess whether the fees should be disallowed.

F. **Multiple Attorneys in Attendance at Hearings.**

44. It is well settled that where multiple attorneys attend a hearing, the fee application must justify the need. See U.S. Trustee Fee Guidelines, Section III, 3. *See also* In re Office Products, *supra* at 977. Multiple attorneys from Arent Fox and Mr. Skelton attended most of the hearings in this case. The fee applications did not contain an adequate explanation of the reason multiple attorneys were needed. At trial, TKO will submit evidence showing all of the hearings where multiple attorneys attended on behalf of the Committee.

G. **Vague Entries.**

45. It is well settled that the court may disallow fees requested where the entries are vague making it impossible to tell what work was done or whether the time spent was reasonable. *Id. at 976*. The Fee Applications contain numerous vague entries where there is no way to tell if the amount of time spent was justified. At trial, TKO will list all the vague time entries contained in all of the fee applications.

H. **Reimbursable Expenses.**

46. Pursuant to the local rules, law firms which apply for the reimbursement of expenses are permitted to charge twenty-five cents per page for faxes. In this case Arent Fox charged $1.50 per page for faxes and is requesting the sum of $1,682.50. Using the proper rate, the charge should only have been $280.

## CONCLUSION

For all of the foregoing reasons, TKO submits that the Fee Applications should be disallowed or dramatically reduced.

Case 05-48509   Document 342   Filed in TXSB on 10/10/2006   Page 17 of 18

DATED:     October 10, 2006.

        Respectfully submitted,

        WEYCER, KAPLAN, PULASKI & ZUBER, P.C.

        By:  /s/ *Edward L. Rothberg*
        EDWARD L. ROTHBERG
        State Bar No. 17313990, Fed. I.D. No. 2780
        HUGH M. RAY, III
        State Bar No. 24004246, Fed. I.D. No. 22090
        MELISSA A. HASELDEN
        State Bar No. 00794778, Fed. I.D. No. 19704
        Eleven Greenway Plaza, Suite 1400
        Houston, Texas 77046
        Telephone: (713) 961-9045
        Facsimile:  (713) 961-5341

        ATTORNEYS FOR DEBTOR

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was forwarded by first class mail, postage prepaid, on October 10, 2006, to:

*Debtor*:
TKO Sports Group USA, Limited
Attn: Garry Kurtz, President
6100 West By Northwest Blvd.
Suite 160
Houston, TX 77040

*US Trustee*:
Stephen Statham
Office of the United States Trustee
515 Rusk, Room 3401
Houston, Texas 77002

**Secured Lender:**
Bank of Montreal
Attn: Tony Crow
100 King St. West 7th Floor
Toronto, Ontario
Canada M581A1

Diana Woodman
Thompson & Knight
333 Clay Street, Suite 3300
Houston, Texas 77002
*(Attorneys for Bank of Montreal)*

**Counsel for Official Committee of Unsecured Creditors:**
Andrew I. Silfen
Schuyler G. Carroll
Arent Fox PLLC
1675 Broadway
New York, NY 10019

and

Barnet B. Skelton, Jr.
1111 Bagby, 47th Floor
Houston, TX 77002

Case 05-48509    Document 342    Filed in TXSB on 10/10/2006    Page 18 of 18

**Committee of Unsecured Creditors:**

Qingdao Inred Sport Goods Co., Ltd.
Attn: Jerry Yu General Manager
Liu Ting Xin Xing JianCai Industrial Park
Chengyang District, Qingdao,
P.R.China
Email: qdinred@qd-public.sd.cninfo.net
       anneli@163169.net

Olympic International Limited
Attn: David Barr
Suite 1505-6, Albion Plaza
Granville Road, Tsimshatsui
Kowloon, Hong Kong
Email: david@olympiclife.com

Sports K-Pro Ltd.
Attn: Morris Huang, President
c/o No. 10-3 West 10th Street
K.E.P.Z. Kaohsiung
Taiwan, R.O.C.
Email: sakurai@tpts4.seed.net.tw
       twnsakurai@hibox.hinet.net

C & M Holdings Ltd.
Attn: Chad Huang
Room 11 B, Shang Hu Xuan J
ZhuJiang DiJing
Yi Yuan Bei Lu
GuangZhou City, China
Email: chadhuang@21cn.com
       chadhuang@hotmail.com

Sunex Sports Co., Ltd.
Attn: Mr. James Chen
2F-2, No. 242 Sec. 1
Taichung - Harbor Road Taichung
Taiwan, R.O.C.
Email: sunex@ms47.hinet.net


      /s/ *Edward L. Rothberg*
      EDWARD L. ROTHBERG