IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| TKO SPORTS GROUP USA LIMITED, | § § § | CASE NO. 05-48509-H4-11<br>CHAPTER 11 |
| DEBTOR | § | |

### DEBTOR'S SUPPLEMENTAL OBJECTION TO FINAL FEE APPLICATION OF ARENT FOX, PLLC (DOC. 337)

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The Reorganized Debtor, TKO Sports Group USA Limited ("TKO") hereby supplements its prior objection to the Final Fee Application filed by Arent Fox, PLLC ("Arent Fox") as counsel to the Committee ("Committee Counsel"). The grounds for this supplemental objection are as follows:

### Summary of Objection

1.  **Arent Fox Knowingly Allowed Breaches of Duty and Misbehavior of "Proxy" for Creditor.** In TKO's original objection, the extent of Arent Fox's relationship with Joseph Myers was not known. TKO has discovered that Mr. Myers solicited a position on the Committee with the "business plan" of a back-end engagement as a trustee under the plan. Indeed, Arent Fox represents Myers in over 75 adversary proceedings as trial counsel as liquidating or litigation trustee. Consequently, Myers approved millions of dollars in Arent Fox fees and has been paid nearly $1 Million by these engagements in the last few years. When deposed, Myers admitted he probably <u>did not disclose</u> his intention of seeking employment on the back-end to the entire committee.[1] He certainly never told the U.S. Trustee.[2] However,

---

[1] Myers depo. P. 83-84. A copy of the entire deposition is attached as Exhibit "A".

{L:\TKO000\00012\0428830.DOC;1\HMR}

1

Arent Fox knew of Myers's "business plan", and knew that he became an attorney-in-fact of a committee member with intent of undisclosed profit as liquidating trustee. Myers, sitting on the Committee, was privy to confidential information that no other proposed trustee would have about proposed structures for settlement with the Debtor.[3] Arent Fox failed to alert the United States Trustee, the Debtor, this Court, or the Committee itself to the illegal self-dealing of Myers.

2. **Arent Fox Failed to Disclose Connections with Myers.** Arent Fox, as the *current counsel* for Myers in over 75 adversary proceedings, knew of their "connections" with him and of his intent to make a secret profit. Myers had previously hired Arent Fox to pursue Chapter 5 causes of action as a trustee in other cases. Yet, Arent Fox did not disclose their connections with him – the fact that he was their *client* and that he spoke to Arent Fox's *bankruptcy attorneys every week*. Arent Fox made, after 8 months of the case had passed, an anemic and absurdly understated "amended" disclosure that they represent Mr. Myers and he has been on other committees in cases with them.

3. Arent Fox did not disclose the millions it was currently being paid by Myers in other cases. The information was eventually elicited from Myers at the deposition in his counsel's office in New York City. Arent Fox has still failed to disclose the social contacts between Myers and Arent Fox, including their unpaid work together as speakers and in trade organizations.

4. **Arent Fox is Estopped from Charging More than the "Preferred Discounted" Rates They Swore they Would Charge.** Arent Fox's application was granted based upon the sworn statement of Arent Fox that lead counsel would charge a "preferred discounted" rate that discounted the rate of the partner in charge to approximately 18% of his normal rates and

---

[2] Myers depo p. 180.
[3] Myers depo p. 91 (inside information that his position was contemplated) and p. 109 (settlement offer of 30%).

insinuated other discounts. *The "preferred" rate was never charged.* Instead of the $445 an hour listed in the application, Arent Fox charged a full $560[4] rate for the partner who actually handled the case. The associate rates were likewise not discounted. If any fees are awarded to Arent Fox, they should be additionally discounted by 18% to force Arent Fox to stand by the representation made to this Court.

5.  **Myers has not fulfilled his Obligations to the Estate**. Myers, who is charged as a fiduciary of the estate with reviewing applications, admitted that he generally does not review pleadings -- in this case or the other cases wherein he has approved Arent Fox's fees.[5] Myers admitted that he had no prior relationship with Olympic (the TKO Creditor) and that he only contacted Olympic after learning of the case from Mahoney Cohen (who also obtained employment in this case without disclosure of their connections to Myers).[6] Myers' conduct in obtaining his position in this bankruptcy case warrants his removal for cause.

### Additional Background

6.  **Connections between Myers and Arent Fox** Myers was an attorney in fact for a Creditor. As such, he is either <u>the creditor itself</u> or he is the <u>attorney for the creditor</u>. Rule 2014 requires, *inter alia,*

> The application shall state the . . . to the best of the applicant's knowledge, **all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants**, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the **person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants**, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014(a) (emphasis added).

---

[4] The rate was $530 for a brief period, then escalated to $560 per hour.
[5] Myers depo. P. 62, 75, 81-82.
[6] Myers depo. P. 5-6, 16-17.

Case 05-48509   Document 406   Filed in TXSB on 04/03/2007   Page 4 of 17

7. The duty to disclose is a continuing one, to which counsel will owe the highest obligation of candor – at the risk of losing the right to be paid. *I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 355 (5th Cir. 2005).

8. When Arent Fox declared they had no "connections" with the creditor Mr. Myers represented, they attempted to distinguish between Myers and his principal. However, the Code does not allow for such a distinction. A proxy is the <u>same as a creditor</u>, with "full power of substitution, to vote on any question that may be lawfully submitted to creditors of the debtor in the above-entitled case . . . , and in general to perform any act not constituting the practice of law for the undersigned in all matters arising in the case."[7] The proxy <u>is</u> the creditor.

9. In the *Dow Corning* case, the U.S. Trustee attempted to argue that attorneys and proxies of creditors can be members of the committee somehow considered separate from the creditors themselves. The Court noted that, <u>while the 1978 act had distinguished proxies and attorneys from the actual members of the committee, such language was deleted from current Code</u> Section 1102:

> The United States trustee's attempt to read "or the persons' attorneys" into § 1102(b)(1) is improper for two reasons of statutory interpretation. First, the statute simply does not say that.
>
> Second, the statute in essence used to say that but Congress intentionally deleted that language. Section 44(b) of the now repealed Bankruptcy Act, 11 U.S.C. § 72 (repealed) formerly stated:
>
>> Such creditors may, at their first meeting, also appoint a committee of not less than three creditors, which committee may consult and advise with the trustee in connection with the administration of the estate, make recommendations to the trustee in the performance of his duties, and submit to the court any question affecting the administration of the estate.
>
> And "creditor" was defined under § 1(11) of the Act as including the actual creditor's "duly authorized agent, *attorney or proxy*." 11 U.S.C. § 1 (repealed) (emphasis added). In 1978, with the adoption of the Code, that language was

---

[7] Official Form 11-A (Power of Attorney). Mr. Myers' power of attorney contains similar language.

dropped. Now, § 1102 speaks only of persons holding "claims" being appointed to a committee, and the definitions of "creditor" (§ 101(10)) and "claim" (§ 101(5)) leave no room for an "authorized agent, attorney or proxy" to fit.

This was no accident. "Congress was most concerned that effective creditor control under the Act had been subsumed by lawyers. It was widely believed that 'in practice, creditor control has become attorney control, and the bankruptcy system operates more for the benefit of attorneys than for the benefit of creditors.'" Judicial Misinterpretations of Creditors' Committees, 1 Bankr. Dev. J. 107, 110 1984), quoting H.R. Rep. No. 95-595, 95th Cong. 2d Sess. 1, 92 (1977). Upon enacting the Bankruptcy Code, Congress intentionally changed the prior law which allowed lawyers too much control over creditors' committees. . . . .

*In re Dow Corning Corp.*, 194 B.R. 121, 137 (Bankr. D. Mich. 1996).

If Myers was on the committee, the law says he *is* the creditor, and he cannot distinguish his position as *proxy* from that as member of a committee. Under the 1978 Code, he could, but that distinction was abolished. Arent Fox was thus obligated to disclose connections with Myers because the law considers Myers and the creditor to be the same entity. This follows Congress' policy, to prevent a creditor from hiring multiple proxies and attorneys to game the system and inflate their impact on a committee.

10. Likewise, Congress intended that a proxy-holder would disclose both *his own* connections and his principal's. Ordinary corporate law forbids a proxy from withholding material information about his potential to make a secret profit, though his principal may not profit. For instance, in *Gaither v. Moody*, 528 S.W.2d 875, 877 (Tex. App.—Houston [14th Dist.] 1975 writ ref'd n.r.e.), the trial court granted summary judgment against Gaither because the two corporations (Western Republic Life Ins. Co. and Surety Nat'l. Live Ins. Co.) disclosed information relevant to them, but not Mr. Moody's (proxy holder) secret profit. The Court reversed, noting Mr. Moody, as proxy, owed fiduciary duties to shareholders of both corporations and that his private profit was likely material information. The disclosure

obligations of the Bankruptcy Code follow those established in corporate law, for the same reasons. The attorney-in-fact's fiduciary obligation is to reveal not only material information about his principal, but also information about *himself*.

11. Likewise, counsel for the Committee, with connections to the proxy and knowledge of his business plan, owes a fiduciary duty to the Committee and the Court to disclose that material information.

12. The duty to avoid conflicts of interest reaches beyond the mere duty to disclose connections, and when the counsel has a personal interest in hiring an estate fiduciary, the duty goes to **full disclosure** to "be free of the slightest personal interest":

> We have observed that these standards are "strict" and that attorneys engaged in the conduct of a bankruptcy case "**should be free of the slightest personal interest** which might be reflected in their decisions concerning matters of the debtor's estate or which might impair the high degree of impartiality and detached judgment expected of them during the course of administration." Accordingly, we are "sensitive to preventing conflicts of interest" and require a "'painstaking analysis of the facts and precise application of precedent'" when inquiring into alleged conflicts. If an actual conflict of interest is present, "no more need be shown . . . to support a denial of compensation."

*In re W. Delta Oil Co.*, 432 F.3d at 355 (emphasis added, footnotes omitted).

13. Arent Fox has much more than a "hint" of a personal interest with Myers and requires more than the absurdly understated "disclosure" 8 months after being employed, which was the first indication that Myers had any relationship with Arent Fox:

> Joseph Myers ("Myers") is a Managing Director of Clear Thinking Group LLC ("CTG") and serves as a representative of Olympic International Limited, the Chair of the Committee. Myers and/or CTG serves as creditor, liquidating or similar type of trustee and plan administrator or creditor representative in numerous bankruptcy cases unrelated to the Debtor throughout the United States. Arent Fox has represented and continues to represent Myers and/or CTG in such capacities in other pending bankruptcy cases. Myers and/or CTG has acted as agent or representative and continues to act as agent or representative of certain creditors in matters unrelated to the Debtor who are members of a creditors committee that has engaged Arent Fox as counsel. Arent Fox does not represent Myers or CTG or an entity represented by Myers or CTG in this proceeding.

Supplemental Disclosure (docket #176 at p.2).

14. Arent Fox willfully failed to disclose their connections with Myers. Arent Fox represented Myers in numerous cases as trustee's counsel, and continues to do so today. Arent Fox knew of the representation when it filed its declaration, as it was in nearly continuous contact with Myers and had been paid millions of fees in dozens of cases and adversary proceedings. Arent Fox chose not to disclose the information. Indeed, Arent Fox has stated that it <u>decided</u> not to disclose the connection with Myers because he was not an attorney at law for the creditor he represented. This non-disclosure was not an accident, but a willful attempt to game the bankruptcy system.

### Mr. Myers' Deposition Testimony

15. **Evasive answers – didn't understand word "connections".** Myers' deposition was taken in New York at the expense of TKO. In his deposition, Myers was evasive and his counsel argumentative. For instance, Myers didn't understand what a "connection" was:

```
19   (By Mr. Ray) You had other connections with
20   other individuals at Arent Fox?
21      A.   Explain connections, I don't
22   understand the question.
23      Q.   When I say connections, I mean a
24   connection such an attorney/client
25   relationship, a connection, a contractual
 2   relationship, or it could be in connection
 3   such a close social relationship.
 4        Do you understand that?
 5      A.   I understand, yes.
 6        I had --
 7        MR. SILFEN:  I object as to form.
 8        MR. HERMAN:  Why don't you make it
 9     three separate questions?
10        MR. SILFEN:  Specify the time
11     period.
12      Q.   Since the beginning of the
13   creation of the universe until you sat down in
```

```
14  this chair here today, sir. I want you to
15  tell me about every contractual relationship
16  you have ever had with an individual at Arent
17  Fox.
18     A.  Contractual relationships?
19         MR. SILFEN: Do you know what he
20     means by contractual relationships,
21     because I don't.
22     A.  I was going to ask him to define
23  that.
24         Can I talk to –
```

Myers Deposition p. 9-11.

16. **Myers Didn't Recall forcing Arent Fox to Charge the "Preferred" Rates Promised.** The deposition continued and Myers couldn't recall whether he had ever checked Arent Fox's fee applications to see if the fees charged were at the promised "preferred" rates:

```
22     Q.  Arent Fox in the Lantis case
23  claimed to be charging a preferred rate.
24         Do you see that?
25     A.  Yes, sir.
 2     Q.  What does that mean to you, does
 3  it mean it has reduced it; is that your
 4  understanding?
 5     A.  Yes, sir.
 6     Q.  Okay.
 7         Look at Exhibit 18, do you see the
 8  words, "reduced preferred hourly rate?"
 9     A.  Yes, sir.
10     Q.  Okay.
11         Do you see the numbers there?
12     A.  Yes.
13     Q.  The reduced preferred rate on
14  Exhibit 8 is 445, right?
15     A.  Yes, sir.
16     Q.  The reduced preferred rate on
17  Exhibit 18 is 445?
18     A.  Yes, sir.
19     Q.  What's the usual rate?
20         MR. HERMAN: If you know.
21     A.  I don't know.
22     Q.  Do you know whether or not Arent
23  Fox actually ever billed in either the Lantis
```

```
24  or TKO case Schuyler Carroll at the 445 rate?
25      MR. SILFEN: Do you know?
 2  A.  I don't know.
 3  Q.  But the fee apps will show what
 4  they show?
 5  A.  Yes.
```

Myers Deposition at. p. 134-136.

17.  Obviously, Myers and his counsel (and Committee Counsel) played games in the deposition. More importantly, as shown above, Myers didn't understand the word "connections" and didn't know whether Arent Fox had actually billed the "preferred" rate of $445 in the Lantis and TKO cases. Myers, a fiduciary of the estate, has come dangerously close to being a mere tool of the Committee Counsel.

18.  **Myers Refused to Answer Question as to Whether Arent Fox's Affidavit was Truthful.** In the *Lantis* case, Arent Fox filed a revised affidavit months after the case began. Myers said he did not typically review pleadings. When asked if the affidavit was truthful, Myers counsel instructed him not to answer. In *Lantis*, Myers was employed pre-confirmation as attorney-in-fact for a committee member, returning the favor by employing Arent Fox post-confirmation. (Mr. Herman, Myers' counsel, and Mr. Silfen played more games during the deposition):

```
 8  (By Mr. Ray) Sir, going back to Exhibit 5, I
 9  see that Schuyler Carroll represented you in
10  the Blackwood case in your capacity as trustee
11  at least as of April 28th, 2004.
12      Do you see that?
13  A.  Yes.
14  Q.  This is a revised affidavit,
15  Exhibit 8, on behalf of Arent Fox in the
16  Lantis case. If you look at the last date it
17  was sworn to on June 25th, 2004 which is
18  months later.
19  A.  Yes.
```

{L:\TKO000\00012\0428830.DOC;1\HMR}

9

```
20        MR. HERMAN: When you say yes
21   there, you say you see it?
22   A.   Yes, I see the date.
23        MR. HERMAN: You're not asking
24   whether he knows if it is true or not?
25        MR. RAY: Not yet.
 2        MR. HERMAN: Simply if you see it.
 3   A.   Yes.
 4   Q.   You were hired in the Lantis case;
 5   is that correct?
 6        MR. SILFEN: Objection to form.
 7   Q.   At some point you were hired in
 8   the Lantis case?
 9        MR. SILFEN: Hired by who and when?
10   Q.   By anyone at any time.
11        At some point you were hired in
12   the Lantis case, right?
13   A.   I --
14        MR. SILFEN: Objection to form.
15   A.   I became a postconfirmation, I did
16   receive a postconfirmation engagement, yes.
17   Q.   Preconfirmation did you have
18   anything to do with the Lantis case?
19   A.   Yes.
20        I held a proxy and served as a
21   proxy for the member of the Lantis committees.
22   Q.   When you have a proxy and you
23   serve as a member of the committee's
24   representative, do you receive pleadings?
25   A.   Typically, no.
 2   Q.   Do you review pleadings?
 3   A.   Typically no.
 4   Q.   You rely on committee counsel to
 5   assist you in reviewing pleadings?
 6   A.   Yes.
```

Myers Deposition pp. 60-62.

19.   When asked if the affidavit in the *Lantis* case was truthful, Myers refused to testify whether he thought Arent Fox's failure to disclose his connection was <u>truthful</u>:

```
22   (By Mr. Ray) Can you turn to page four of the
23   affidavit, paragraph 10. It says,
24   "Exhibit "2" contains a list of the
25   Parties-in-Interest or their affiliates that
```

```
 2  Arent Fox has represented or currently
 3  represent in matters wholly unrelated to the
 4  debtor and its estate."
 5     A.  Yes.
 6     Q.  Do you see that in paragraph 10?
 7     A.  Yes.
 8     Q.  The reference to Exhibit 2, can
 9  you turn to Exhibit 2, the last page.
10         You're not referenced in
11  Exhibit 2, it's the last page of the document.
12         Is that correct?
13     A.  Yes, sir.
14     Q.  I'm going to ask you, do you have
15  an opinion one way or another as to whether or
16  not Exhibit 8 is truthful?
17         MR. SILFEN:  Objection.
18         MR. HERMAN:  Objection.
19         Have you seen it before or even
20  read it?
21         THE WITNESS:  I have never seen it
22  before.
23         DI [sic]
24         MR. HERMAN:  Don't answer the
25  question.
```
Myers Deposition pp. 62-63

20.     Myers refused to say whether he thought Arent Fox's disclosures were truthful. This Court can assume it was because Myers knew Arent Fox's sworn statements regarding connections to Myers were <u>untruthful</u>. Myers' counsel did not give any basis for the instruction not to answer. Certainly, if Myers thought the disclosures were truthful, he would have said so.

21.     At the deposition, <u>Committee</u> counsel would also instruct <u>Myers</u> not to answer a question while conveniently furnishing a response:

```
 8     Q.  Lantis like Blackwood was one of
 9  your cases in your business model, you took
10  the representation of a committee member for
11  free with the hopes of obtaining some kind of
12  postconfirmation job?
13         DI
14         MR. SILFEN:  Objection.
15         Don't answer that because you never
```

```
16    testified in Blackwood that you
17    represented a committee member, nor were
18    you involved with Blackwood until your
19    appointment.
```

Myers deposition p. 69.

22. While Myers was clever in obstructing his deposition, he was forced to admit certain facts relevant to the current fee application:

    a. Arent Fox has been paid over $2.4 million from Myers, in his representative capacity, or as agent for Clear Thinking Group.[8] That does not include this case, the *North Bay Hospital* case or the *Surgical Dexterity* case, pending in the Southern District of Texas).

    b. Myers hired Arent Fox in the *Lantis* case, following the same "business model" used in this case (solicitation of a member of the committee to become their attorney-in-fact).[9] Clear Thinking Group (Myers' company) was paid over $200,000 in the *Lantis* Case for its post-confirmation engagement, and continues to be paid.[10] Myers voted to hire Arent Fox in the *Lantis* case and the Committee employed Arent Fox.[11]

    c. Myers hired Arent Fox in the *Tactica* case, using the same method. Clear Thinking Group has been paid over $81,000 from postconfirmation engagement in the *Tactica* case, and continues to receive funds.[12] Arent Fox was hired by Myers in the *Tactica* case.[13]

    d. Myers was briefly appointed to the committee of the *North Bay Hospital* case, using the same method as in this case, except he resigned his post from the committee the next day. However, before he resigned, he "spoke of Arent Fox and its success in the *Surgical Dexterity* case" to the committee. The committee ultimately hired Arent Fox.[14]

---

[8] Myers depo P. 50-52.
[9] Myers depo p. 68-69
[10] Myers depo p. 74.
[11] Myers depo p. 68-69.
[12] Myers depo p. 78.
[13] Myers depo p. 78.
[14] Myers depo p.

### Committee Counsel Represented it Would Charge a "Preferred" Rate

23.     Arent Fox's failure to disclose connections with Myers, founded over years of representation and millions of dollars paid by him, warrants disallowance of all fees sought in this case. However, even if the Court overlooks Arent Fox's violations of disclosure obligations, and evidence of Arent Fox's intent to play games with this Court, Arent Fox simply cannot explain why it filed an untruthful affidavit with the Court – stating that Mr. Carroll would be lead counsel, and that he would charge a "reduced, preferred rate". Mr. Carroll, indeed all of Arent Fox's counsel, charged their full rates. Mr. Carroll charged $495-530 an hour, not $445.

24.     In its Affidavit filed with the Court to gain employment, Arent Fox stated nearly exactly the same language it stated in the *Lantis* case, to wit, that Schuyler Carroll would be lead counsel and that he would charge a preferred, reduced rate:

> My reduced "Preferred" hourly rate, which I have agreed to charge for this matter, is $445 per hour.

Affidavit of Schuyler Carroll, at p. 5.

25.     Yet, the fees charged by Mr. Carroll on that very month were billed at $495. The next month, they increased to $530.

26.     Likewise, Arent Fox apparently failed to reduce the fees of its other partners, including the *de facto* lead counsel, Mr. Silfen. Mr. Silfen charged $575-595 an hour. If he was under the supervision of the lead counsel, his rates should have been lower.

27.     If Arent Fox had been completely forthright in its affidavit and fee application, it would have reduced all partner rates to a maximum of $445. If the partners had agreed to taking a 20% reduction from their rates, the associates and paralegals should have likewise been reduced. In any case, Arent Fox never reduced its rate charged, even after the Affidavit was pointed out to the Court.

28. "'Judicial estoppel is a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position.'" *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999)(citing *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988)). The purpose of the doctrine is "'to protect the integrity of the judicial process', by, 'preventing parties from playing fast and loose with the courts to suit the exigencies of self interest.'" Id. (citation omitted).

29. Judicial estoppel requires "judicial acceptance" of the prior position, such as by granting the relief sought. See *United States for use of American Bank v. C.I.T. Construction Inc. of Tex.*, 944 F.2d 253, 258 (5th Cir. 1991) ("The 'judicial acceptance' requirement minimizes the danger of a party contradicting a court's determination based on the party's prior position and, thus, mitigates the corresponding threat to judicial integrity"). Here, this Court was convinced to accept Arent Fox's employment upon the affidavit of the proposed counsel. The affidavit stated that the fees would be, at least in part, a "preferred" and "reduced" rate. These fees were not reduced. Moreover, the fees were not reduced in the *Lantis* case where the same inaccurate representation was also made.

30. Accordingly, this Court should not authorize the fees as sought, but should impose a 18% reduction in the rates sought, to the extent any fees are authorized.

31. The Court should also consider that the representation was made in other cases, and not honored there. While some Circuits (not the Fifth) only apply judicial estoppel for intentional manipulation and misrepresentations, there is sufficient evidence of direct manipulation here. To wit, the *Lantis* affidavit and the language about preferred rates was modified when the affidavit was filed in the present case. That modification indicates that someone carefully reviewed the affidavit, and that the language was intentionally inserted.

Case 05-48509    Document 406    Filed in TXSB on 04/03/2007    Page 15 of 17

### Remove Myers for Cause

32.     The plan of reorganization, at the Committee's insistence, included a provision for a representative (Mr. Myers) to remain in the position of an observer, who would be paid up to $10,000 a year, and who would have the ability to send notice of an event of a default:

> 5.3.2   <u>Creditor Representative</u>. The Holders of Class 3 Claims shall be entitled to have a Creditor Representative to act as representative and observation and default notice agent for the Holders of Class 3 Claims, to observe and monitor the Reorganized Debtor and enforce the rights set forth herein. The Creditor Representative shall be selected by the Committee and shall be entitled to receive standard information and inspections rights and the Reorganized Debtor's quarterly and annual unaudited financial reports and in the event of default to request such other financials information as may from time to time be reasonably requested. The Creditor Representative shall be entitled to notice Holders of Class 3 Claims of the occurrence of an Event of Default or breach or violation of the Plan. The Reorganized Debtor shall bear and promptly pay the reasonable costs and expenses of the Creditor Representative; <u>provided</u>, <u>however</u>, such costs and expenses shall not exceed $10,000 per year so long as an Event of Default, breach or violation under the Plan has not occurred.

TKO Plan of Reorganization at paragraph 5.3.2.

33.     Myers, at his deposition, disclosed an unwillingness to act impartially and independently from the Committee Counsel. At the heart of the non-disclosure is the underlying issue of his faithfulness to the estate. Myers has not challenged Arent Fox's fees in the *Lantis* case. Myers has engaged in a pattern of self-dealing and non-disclosure prior to his employment. TKO no longer has confidence in him. He should be replaced by one who would act in the best interests of the class 3 creditors, and not in his own self interest.

Case 05-48509   Document 406   Filed in TXSB on 04/03/2007   Page 16 of 17

## CONCLUSION

For all of the foregoing reasons, TKO submits that the Fee Application should be disallowed or dramatically reduced.

DATED:   April 3, 2007.

Respectfully submitted,

WEYCER, KAPLAN, PULASKI & ZUBER, P.C.

By: /s/ *Edward L. Rothberg*
    EDWARD L. ROTHBERG
    State Bar No. 17313990, Fed. I.D. No. 2780
    HUGH M. RAY, III
    State Bar No. 24004246, Fed. I.D. No. 22090
    MELISSA A. HASELDEN
    State Bar No. 00794778, Fed. I.D. No. 19704
    Eleven Greenway Plaza, Suite 1400
    Houston, Texas 77046
    Telephone: (713) 961-9045
    Facsimile:   (713) 961-5341

ATTORNEYS FOR DEBTOR

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was forwarded by first class mail, postage prepaid, on April 3, 2007, to:

***Debtor:***
TKO Sports Group USA, Limited
Attn: Garry Kurtz, President
6100 West By Northwest Blvd.
Suite 160
Houston, TX 77040

***US Trustee:***
Stephen Statham
Office of the United States Trustee
515 Rusk, Room 3401
Houston, Texas 77002

**Secured Lender:**
Bank of Montreal
Attn: Tony Crow
100 King St. West 7th Floor
Toronto, Ontario
Canada M581A1

Diana Woodman
Thompson & Knight
333 Clay Street, Suite 3300
Houston, Texas 77002
*(Attorneys for Bank of Montreal)*

**Counsel for Official Committee of Unsecured Creditors:**
Andrew I. Silfen
Schuyler G. Carroll
Arent Fox PLLC
1675 Broadway
New York, NY 10019

and

Barnet B. Skelton, Jr.
1111 Bagby, 47th Floor
Houston, TX 77002

**Committee of Unsecured Creditors:**

Qingdao Inred Sport Goods Co., Ltd.
Attn: Jerry Yu General Manager
Liu Ting Xin Xing JianCai Industrial Park
Chengyang District, Qingdao,
P.R.China
Email: qdinred@qd-public.sd.cninfo.net
       anneli@163169.net

Olympic International Limited
Attn: David Barr
Suite 1505-6, Albion Plaza
Granville Road, Tsimshatsui
Kowloon, Hong Kong
Email: david@olympiclife.com

Sports K-Pro Ltd.
Attn: Morris Huang, President
c/o No. 10-3 West 10th Street
K.E.P.Z. Kaohsiung
Taiwan, R.O.C.
Email: sakurai@tpts4.seed.net.tw
       twnsakurai@hibox.hinet.net

C & M Holdings Ltd.
Attn: Chad Huang
Room 11 B, Shang Hu Xuan J
ZhuJiang DiJing
Yi Yuan Bei Lu
GuangZhou City, China
Email: chadhuang@21cn.com
       chadhuang@hotmail.com

Sunex Sports Co., Ltd.
Attn: Mr. James Chen
2F-2, No. 242 Sec. 1
Taichung - Harbor Road Taichung
Taiwan, R.O.C.
Email: sunex@ms47.hinet.net

/s/ *Edward L. Rothberg*
EDWARD L. ROTHBERG

{L:\TKO000\00012\0428830.DOC;1\HMR}

17